

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00224-CV

**CITY OF SAN ANTONIO**,
Appellant

v.

Aaron **TREVINO**,
Appellee

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2020-CI-24578
Honorable Cynthia Marie Chapa, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Patricia O. Alvarez, Justice
                Lori I. Valenzuela, Justice

Delivered and Filed: December 7, 2022

REVERSED AND RENDERED

The City of San Antonio (the "City") appeals the trial court's denial of its motion for summary judgment, which was based on the City's argument that it was immune from suit and liability for any alleged injuries suffered by Aaron Trevino following an automobile accident involving Trevino's vehicle and a vehicle driven by a San Antonio police officer. We reverse and render a dismissal of Trevino's claims against the City.

**BACKGROUND**

On an afternoon in November 2019, San Antonio Police Officer Robert Ramos was in his police patrol car in the parking lot at North Star Mall when he received a "criminal mischief" dispatch call that required him to travel southbound on McCullough Road away from McCullough's intersection with Loop 410.

Upon turning from the exit lane onto southbound McCullough, Ramos received another dispatch call requiring him to respond to a "theft of motor vehicle in progress" at the Drury Inn located on the northside of Loop 410. To get to the Drury Inn, Ramos needed to travel northbound on McCullough instead of southbound. Ramos contended that, as he drove off the mall's property and onto the southbound lane of McCullough, he checked his mirrors and turned his head to look for traffic. Ramos stated he did not see any vehicle that would impede his intended northbound route; therefore, he began crossing the southbound lanes of McCullough toward the northbound lanes. As he made his U-turn, his vehicle struck the passenger side of a vehicle driven by Aaron Trevino.

Trevino sued the City for negligence, alleging both bodily injuries and property damage. The City filed a combined motion for a no-evidence and a traditional summary judgment. In its motion for a traditional summary judgment, the City asserted the trial court lacked jurisdiction over Trevino's claims because it was immune from suit and liability based on three theories: (1) the emergency exception to the waiver of immunity, (2) the 9-1-1 emergency exception to the waiver of immunity, and (3) the doctrine of official immunity. The City also moved for a no-evidence summary judgment on various grounds. Trevino filed a response. After conducting a hearing, the trial court signed an order denying the City's motion for summary judgment without stating its grounds. This accelerated appeal by the City ensued. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8).

**STANDARD OF REVIEW**

Trevino, as the plaintiff, had the burden to affirmatively demonstrate the trial court's jurisdiction. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019). "That burden encompasses the burden of establishing a waiver of sovereign immunity in suits against the government." *Id.* "When a defendant[, such as the City,] challenges jurisdiction, a court 'is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised.'" *Id.* (quoting *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)). "A jurisdictional challenge, including one premised on sovereign immunity, 'may be raised by a plea to the jurisdiction, as well as by other procedural vehicles, such as a motion for summary judgment.'" *State v. Lueck*, 290 S.W.3d 876, 884 (Tex. 2009) (citation omitted); *Town of Shady Shores*, 590 S.W.3d at 551 (allowing jurisdictional challenges via no-evidence motions). In this case, the City filed a motion for summary judgment asserting the trial court lacked jurisdiction over the lawsuit filed by Trevino.

When, as here, the motion for summary judgment challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004). When consideration of a trial court's subject-matter jurisdiction requires the examination of evidence, the trial court exercises its discretion in deciding whether the jurisdictional determination should be made at a preliminary hearing or await a fuller development of the case. *Id.* In a case in which the jurisdictional challenge implicates the merits of the plaintiff's cause of action and the jurisdictional challenge includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists. *Id.* "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Id.* at 227-28. However, if the

relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the jurisdictional challenge as a matter of law. *Id.* at 228.

By requiring the governmental entity to meet the summary judgment standard of proof in cases like this one, the plaintiff is protected from having to "put on their case simply to establish jurisdiction." *Id.* (citation omitted). Instead, after the governmental entity asserts and supports with evidence that the trial court lacks subject matter jurisdiction, the plaintiff, when the facts underlying the merits and subject-matter jurisdiction are intertwined, must show there is a disputed material fact regarding the jurisdictional issue. *Id.*

Because the City, as the movant, filed a hybrid summary judgment motion on both no-evidence and traditional grounds, we first review the trial court's judgment under the no-evidence standard of review. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). Trevino, the non-movant, had the burden to present evidence establishing a material issue of fact concerning the element under attack. *Id.* If Trevino failed to produce legally sufficient evidence to meet his burden, there is no need to analyze whether the City satisfied its burden under the traditional motion. *Id.* To prevail on a traditional summary judgment motion, the City had to establish that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). We review the evidence presented by the motion and response in the light most favorable to the non-movant, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Id.* (no-evidence); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005) (traditional).

**IMMUNITY FROM LIABILITY AND SUIT**

"Governmental immunity operates like sovereign immunity to afford similar protection to subdivisions of the State, including counties, cities, and school districts." *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). "[G]overnmental immunity has two components: immunity

from liability, which bars enforcement of a judgment against a governmental entity, and immunity from suit, which bars suit against the entity altogether." *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). Immunity from suit prohibits suits against a governmental entity unless the Legislature expressly consents to the suit. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003); *see also Rusk State Hosp. v. Black*, 392 S.W.3d 88, 93 (Tex. 2012) ("immunity from suit completely bars actions against those entities unless the Legislature expressly consents to suit"). A statute shall not be construed as waiving immunity "unless the waiver is effected by clear and unambiguous language." TEX. GOV'T CODE § 311.034; *see also Tooke*, 197 S.W.3d at 333 ("waiver of immunity must be clear and unambiguous.").

## WAIVER OF IMMUNITY

"A party suing a governmental entity must establish the state's consent, which may be alleged either by reference to a statute or to express legislative permission." *City of San Antonio v. Smith*, 562 S.W.3d 75, 80 (Tex. App.—San Antonio 2018, pet. denied). "Absent the state's consent to suit, a trial court lacks subject-matter jurisdiction." *Id.* Thus, as a governmental unit, the City is immune from suit unless the Legislature expressly waives immunity. The Texas Tort Claims Act (the "TTCA") waives immunity for certain tort actions against governmental units. *See City of San Antonio v. Maspero*, 640 S.W.3d 523, 528 (Tex. 2022) ("The Texas Tort Claims Act . . . provides an exception to immunity by waiving immunity for the negligent acts of government employees in specific, narrow circumstances."). TTCA section 101.021 "has been interpreted to waive immunity in three general areas: 'use of publicly owned automobiles, premises defects, and injuries arising out of conditions or use of property.'" *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 611 (Tex. 2000). Section 101.021 provides that "[a] governmental unit in the state is liable for:"

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM. CODE § 101.021.  Under section 101.021(1), the City is not immune from suit or liability unless an exception to the waiver of immunity applies.

## EXCEPTIONS TO WAIVER OF IMMUNITY

As relevant here, the TTCA contains two exceptions for claims that might otherwise fall within a waiver of immunity: (1) the emergency exception and (2) the 9-1-1 emergency service exception.  *See City of San Antonio v. Rosenbaum*, No. 04-11-00498-CV, 2011 WL 6739583, at *2 (Tex. App.—San Antonio Dec. 21, 2011, no pet.) (mem. op.) ("Even in situations where immunity may generally be waived, such as through the operation or use of a motor vehicle, statutory exceptions for emergencies still can override the immunity waiver.").  Trevino, as the plaintiff, had the burden of negating the applicability of both exceptions.  *See Maspero*, 640 S.W.3d at 529 ("plaintiff bears the burden of negating Section 101.055's applicability").  We first consider whether Trevino negated the application of the emergency exception to the TTCA's limited waiver of immunity.

## THE EMERGENCY EXCEPTION

The emergency exception provides that the TTCA's waiver of immunity "does not apply to a claim arising . . . from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not

taken with conscious indifference or reckless disregard for the safety of others . . ..” TEX. CIV. PRAC. & REM. CODE § 101.055(2).

The underlying policy of the emergency exception to the TTCA's limited waiver of immunity is "to balance the safety of the public with the need for prompt response" from emergency-assistance personnel. *City of Amarillo v. Martin*, 971 S.W.2d 426, 429 (Tex. 1998). Imposing liability for a mere failure in judgment could deter emergency-assistance personnel from acting decisively and taking calculated risks in order to save life or property. *See id.* at 430. This also would "allow for judicial second guessing of the split-second and time-pressured decisions" emergency-assistance personnel are forced to make. *City of San Angelo Fire Dep't v. Hudson*, 179 S.W.3d 695, 699 (Tex. App.—Austin 2005, no pet.).

To carry his burden of proof, Trevino was required to establish the emergency exception does not apply by presenting evidence of one of the following: (1) Ramos was not responding to an emergency call or reacting to an emergency situation, (2) Ramos's actions were not in compliance with the laws and ordinances applicable to emergency action, or (3) Ramos's actions show that he acted with conscious indifference or reckless disregard for the safety of others. *See Quested v. City of Houston*, 440 S.W.3d 275, 284 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

A. **Responding to an emergency call**

The TTCA does not define the terms "emergency call" or "emergency situation," however, "Texas courts have interpreted the term 'emergency' broadly." *See City of Houston v. Sauls*, No. 14-20-00485-CV, __ S.W.3d __, 2022 WL 3009469, at *9 (Tex. App.—Houston [14th Dist.] July 29, 2022, no pet. h.) (and cases cited therein). Because the TTCA does not define "emergency," we look to the ordinary plain meaning of the term. *Torres v. City of Corpus Christi*, No. 13-14-00506-CV, 2016 WL 4578392, at *4 (Tex. App.—Corpus Christi–Edinburg Sept. 1, 2016, no pet.) (mem. op.). "The word 'emergency' is defined as 'a sudden, urgent, usually unexpected

occurrence or occasion requiring immediate action.'" *Sauls*, 2022 WL 3009469, at \*9 (citation omitted). "A pursuit of a stolen vehicle, though sadly common, is still unexpected." *Torres*, 2016 WL 4578392, at \*4.

In its no-evidence motion for summary judgment, the City alleged Trevino had no evidence Ramos was not responding to an emergency call at the time of the accident. In its traditional summary judgment motion, the City relied on Ramos's affidavit as support for its assertion that Ramos was responding to an emergency call. In his affidavit, Ramos stated as follows:

> 5.     Immediately after turning from the exit lane onto southbound McCullough, dispatch reassigned me to a call for service regarding a theft of a motor vehicle in progress at the Drury Inn, which is located on the northside of Loop 410. According to the Incident Detail Report data on my SAPD issued laptop, this theft of a motor vehicle in progress call was received via the City's 9-1-1 system.
>
> 6.     Even if the theft of a motor vehicle in progress had not come in through the City's 9-1-1 system, such a call would constitute an emergency situation. Having investigated stolen vehicle cases in the past, I can say that a stolen motor vehicle presents an unexpected and usually dangerous situation that calls for immediate action. For one thing, a vehicle thief may become violent if confronted in the act of stealing a motor vehicle. Secondly, criminals prefer to use stolen vehicles to commit other crimes, such as drive-by-shootings, drug deals, and burglaries, because it can be difficult to locate an assailant who operates a stolen vehicle rather than one that the assailant owns. Thirdly, a stolen motor vehicle constitutes a major property loss for most individuals. If the stolen motor vehicle is valued from $2,500 to $30,000, it is a theft that is classified as a state jail felony. If a vehicle theft is in progress, then the quick arrival of a police officer may be able to stop it. I have personally investigated countless stolen vehicle cases. On at least one occasion that I can recall, I stopped a stolen vehicle from being disassembled for parts.

In his summary judgment response and in his brief on appeal, Trevino states "[i]t is further *undisputed* that Officer Robert Ramos was operating his police car and responding to an *emergency* situation when the subject wreck occurred." [Emphasis added] However, Trevino then contradicts himself by contending Ramos was responding to a non-emergency Code 1 call. Therefore, he asserts there is a fact issue on whether Ramos was responding to either an emergency Code 2 or emergency Code 3 call. In support of his contention that a fact issue exists, Trevino

points to an "InterOffice Correspondence" completed by Ramos's supervisor who checked the box

"Responding to Code 1 call." As summary judgment proof, Trevino also attached a copy of the

"San Antonio Police Department General Manual, Procedure 403 – Communications," which

defines the three codes as follows:

> A. A Code-One Call is a request for police services which does not present an actual and immediate potential for serious injury, damage or loss of property. A code-one call generally requires only a routine police response.
>
> B. A Code-Two Emergency Call means a request for police service where the immediate rapid response or arrival of police units will reduce the probability of serious injury, damage or loss of property. Common Code-Two responses include bomb threats and animal bite in progress.
>
> C. A Code-Three Emergency Call means a request for police service that presents a threat or immediate danger of death or serious bodily injury to any individual. Both, the threat and the need for assistance must be immediate. An example of a Code-Three emergency call would be a shooting in progress or a disturbance with a knife/gun involved.
> 1. The following calls will be dispatched Code Three . . . burglary vehicle in progress[.]

During his deposition, Ramos stated Code 1 calls do not require lights and sirens, but Code

2 and 3 calls do require lights and sirens. He said he initially was on his way to a criminal mischief

disturbance, which was a Code 1. As he began to move his vehicle from the underground parking

lot at North Star Mall, he was rerouted to a theft of a motor vehicle in progress, which is a Code 2

call. Ramos said he "did not get a chance to activate" his lights and he did not have time to activate

his siren. Although Trevino's counsel attempted to pin Ramos down to the exact moment the call

changed from a Code 1 to a Code 2 or 3, counsel was not able to establish that Ramos was not

responding to an emergency call when his vehicle collided with Trevino's vehicle. We conclude

Trevino did not present summary judgment evidence establishing a material issue of fact

concerning whether Ramos was responding to either a Code 2 or Code 3 *emergency* call at the

moment of the accident.

Trevino also attempted to create a fact issue by contending Ramos was confused about whether the call was a Code 2 or a Code 3. Procedure 403 defines both codes as an "emergency call." Therefore, whether the call was a Code 2 or a Code 3, Trevino did not present summary judgment evidence establishing a material issue of fact concerning whether Ramos was responding to an emergency call when Trevino's vehicle collided with Ramos's patrol car. Additionally, Trevino provided no summary judgment evidence that Ramos was not responding to a "theft of a motor vehicle in progress" at the moment of the accident or that "theft of a motor vehicle in progress" was not an emergency.

Viewing the evidence in the light most favorable to Trevino, we conclude he failed to raise a fact issue on whether Ramos was responding to an emergency call or reacting to an emergency situation at the time of the accident. Accordingly, even if Trevino's claim satisfies the requirements for waiver of immunity under section 101.021(1)(A), because there is no fact issue as to whether Ramos was responding to an emergency, Trevino must show there is a fact issue as to whether the response was not in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law, the action was taken with conscious indifference or reckless disregard for the safety of others. TEX. CIV. PRAC. & REM. CODE § 101.055(2); *see City of Austin v. Powell*, No. 03-21-00146-CV, 2022 WL 1509304, at *5 (Tex. App.—Austin May 13, 2022, pet. filed) (mem. op.) ("Because there is no fact issue as to whether the officers were responding to an emergency, Powell must show that there is a fact issue as to whether the response was not in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, the action was taken with conscious indifference or reckless disregard for the safety of others.").

**B.     Did Ramos's actions violate laws and ordinances applicable to emergency action?**

In its no-evidence motion for summary judgment, the City alleged Trevino had no evidence Ramos did not act in compliance with the laws and ordinances applicable to emergency action. In its traditional summary judgment motion, the City relied on Ramos's affidavit as support for its assertion that Ramos did not violate any applicable law or ordinance. In his affidavit, Ramos stated as follows:

> 7.   In order to respond to the theft of a vehicle in progress at the Drury Inn I would need to drive northbound on McCullough instead of the predetermined southbound route. McCullough has three southbound lanes, two northbound lanes, and no turning lanes at the point where the mall's exit lanes meet McCullough. As I drove off of the mall property and onto the outside southbound lane of McCullough I checked my mirrors and turned my head to look for traffic. At the time, I did not see a vehicle that would have impeded my intended route. I intended on making a U-turn from the outside southbound lane over the southbound middle and inside lanes and onto the northbound lane. As I began traversing the southbound lanes of McCullough toward the northbound lanes, my patrol unit's front right fender made contact with the passenger's side of a motor vehicle. I later learned that this motor vehicle was operated by Aaron Trevino.
>
> 8.   At no time between being dispatched to the theft of a motor vehicle in progress and the time of the subject collision was I operating my patrol vehicle in a reckless manner. I used due regard for the safety of others around me throughout that period, and I did not violate any applicable law, statute, or ordinance that would have governed the operation of an emergency vehicle like mine. I did not: (a) park or stand my patrol unit; (b) proceed past a red signal or stop sign; (c) exceed a maximum speed limit; or (d) disregard a regulation governing the direction of movement or turning in specified directions. There was no sign prohibiting a U-turn on the portion of McCullough that I was on.

In response, Trevino argued Ramos violated laws and ordinances applicable to an emergency action because he failed to activate his lights and siren in violation of Procedure 609 of the San Antonio Police Department General Manual and section 546.003 of the Texas Transportation Code.

Section .07 of the "San Antonio Police Department General Manual, Procedure 609 – Emergency Vehicle Response and Foot Pursuits" provides in pertinent part as follows:

B. Officers authorized to respond to Code-Two or Code-Three emergency calls may utilize emergency vehicles for emergency operations, provided:

    1. The emergency lights and siren are activated;

    2. The posted speed limit is not exceeded by more than ten (10) miles per hour on Code-Two calls;

    3. Officers will come to a complete stop at all traffic control devices which require a stop under normal driving conditions and in consideration to vehicular and pedestrian traffic (i.e., stop signs, red lights, and flashing red lights) and proceed when it can be done safely;

    4. Officers will reduce speed for vehicles and pedestrians at intersections marked by yield signs or yellow flashing lights and proceed when it can be done safely;

    5. Officers will reduce speed and proceed when it can be done safely when driving emergency vehicles into or through school zones during normal school hours or into areas where large crowds are known to congregate, such as city parks and outdoor public events; and

    6. Officers will exercise due regard for the safety of all persons.

C. For an officer to respond to a Code-Two or Code-Three emergency call without using emergency lights or siren, as allowed by the Texas Transportation Code, Section 546.004, an officer must first receive verbal, on-air authorization from a supervisory officer.

There is no dispute Ramos had not activated his siren or lights when he made the U-turn and that he did not receive verbal, on-air authorization to not do so. He also agreed he did not comply with department policy. However, Trevino's argument regarding violations of Procedure 609 was rejected by the Texas Supreme Court in *Maspero*, which also considered Procedure 609. The Supreme Court held, "a police department's internal policies, in and of themselves, are not 'laws' or 'ordinances.'" 640 S.W.3d at 530. The *Maspero* Court also noted that "Procedure 609 explicitly states that it is not binding law; rather, it 'establishes guidelines for officers in situations necessitating the use of emergency vehicles.'" *Id.* "Therefore, even if the evidence raises a fact issue as to [Ramos's] alleged noncompliance with Procedure 609, such noncompliance does not by itself amount to a violation of 'laws and ordinances applicable to emergency action.'" *Id.* (citing TEX. CIV. PRAC. & REM. CODE § 101.055(2)).

Trevino next argued Ramos violated laws and ordinances applicable to an emergency action because he failed to activate his lights and siren in violation of the Texas Transportation Code. "The Texas Transportation Code establishes the law for operating emergency vehicles in Texas." *Medina Cnty. v. Johnson*, No. 04-21-00452-CV, 2022 WL 2707740, at *2 (Tex. App.—San Antonio July 13, 2022, no pet.) (mem. op.). Transportation Code section 546.001 states that the driver of an "emergency vehicle," when "responding to an emergency call," may

> (1) park or stand, irrespective of another provision of this subtitle;
> (2) proceed past a red or stop signal or stop sign, after slowing as necessary for safe operation;
> (3) exceed a maximum speed limit, except as provided by an ordinance adopted under Section 545.365, as long as the operator does not endanger life or property; and
> (4) disregard a regulation governing the direction of movement or turning in specified directions.

TEX. TRANSP. CODE § 546.001; *see also id.* § 546.002(b)(1) ("Sections 546.001(2), (3), and (4) apply only when the operator is . . . responding to an emergency call . . ..").  While engaging in conduct permitted by section 546.001, the driver of the emergency vehicle "shall use, at the discretion of the [driver] in accordance with policies of the department or local government that employs the [driver], [emergency] audible or visual signals." *See id.* § 546.003; *see also id.* § 546.004 ("Exceptions to Signal Requirement").  When read together, sections 546.001 and 546.003 require officers to employ sirens and lights, "consistent with department policy, when they are driving in a way that would violate those laws." *Maspero*, 640 S.W.3d at 530-31.  To raise a fact issue on whether Ramos violated section 546.003's requirements regarding the use of audible or visual signals, Trevino was required to provide evidence of Ramos "engaging in conduct permitted by [s]ection 546.001." TEX. TRANSP. CODE § 546.003.  Trevino does not contend Ramos was engaging in any of the conduct listed in section 546.001.  The only conduct Trevino points to is Ramos's failure to engage his lights or siren before attempting the U-turn.

Furthermore, Ramos's non-use of his lights and siren "is inconsequential for purposes of Section 101.055." *See Maspero*, 640 S.W.3d at 531 ("Moreover, Officer Kory's use of her siren is inconsequential for purposes of Section 101.055."). "Section 101.055(2) requires a causal nexus between the plaintiff's claim and the government employee's reckless or illegal action." *Id.* (citing TEX. CIV. PRAC. & REM. CODE § 101.055(2) (stating the TTCA does not apply to a claim "arising . . . from the action of an employee . . . if *the action* is in compliance with the laws and ordinances applicable to emergency action") (emphasis added)). Trevino fails to explain the causal nexus between his injuries and Ramos's failure to use his lights or siren. "Any suggestion that the [lights or] siren would have prevented the collision . . . is speculation at best." *Id.* Therefore, the evidence that Ramos "failed to use [his lights or] siren does not foreclose the [TTCA's] emergency exception." *Id.*

Viewing the evidence in the light most favorable to Trevino, we conclude he failed to raise a fact issue on whether Ramos violated the laws and ordinances applicable to emergency action. "Accordingly, the exception applies unless a fact issue exists as to whether [Ramos] acted 'with conscious indifference or reckless disregard for the safety of others.'" *Id.*

**C.     Did Ramos act with conscious indifference or reckless disregard?**

A driver of an emergency vehicle is not relieved of "the duty to operate the vehicle with appropriate regard for the safety of all persons" or of "the consequences of reckless disregard for the safety of others." TEX. TRANSP. CODE § 546.005. Thus, the Transportation Code "imposes a duty to drive with due regard for others by avoiding negligent behavior," but "it only imposes liability for reckless conduct." *City of Amarillo v. Martin*, 971 S.W.2d 426, 431 (Tex. 1998). In other words, the Transportation Code does not waive immunity for "mere negligence." *Id.* at 430. A showing of recklessness is required. *Id.* This "standard requires 'conscious indifference,' or 'subjective awareness of an extreme risk.'" *Maspero*, 640 S.W.3d at 531 (citation omitted); *see*

*also City of San Antonio v. Hartman*, 201 S.W.3d 667, 672 n.19 (Tex. 2006) ("conscious indifference" and "reckless disregard" have been interpreted to require proof that a party knew the relevant facts but did not care about the result).

Recklessness reflects more than a "momentary judgment lapse" and instead "requires a showing that the driver committed an act he knew or should have known posed a high degree of risk of serious injury." *Perez v. Webb County*, 511 S.W.3d 233, 236 (Tex. App.—San Antonio 2015, pet. denied); *see also Houston v. Davis*, No. 01-13-00600-CV, 2014 WL 1678907, at *6 (Tex. App.—Houston [1st Dist.] Apr. 24, 2014, pet. denied) (mem. op.) (same); *Smith v. Janda*, 126 S.W.3d 543, 545 (Tex. App.—San Antonio 2003, no pet.) ("operator [must have] acted recklessly; that is, 'committed an act that the operator knew or should have known posed a high degree of risk of serious injury.'" (citation omitted)); TEX. TRANSP. CODE § 545.401(a) (reckless driving consists of driving a vehicle in "willful or wanton disregard for the safety of persons or property").

In its no-evidence motion for summary judgment, the City alleged Trevino had no evidence Ramos committed an act that he knew or should have known posed a high degree of risk of serious injury. In its traditional summary judgment motion, the City relied on Ramos's affidavit as support for its assertion that Ramos did not operate his vehicle in a manner that was reckless. In his affidavit, Ramos stated as follows:

> 9. Although I was responding to an emergency situation that had come through the City's 9-1-1 system, I balanced the need to reach the location of the theft of a motor vehicle in progress against the possible risks to the safety of others. The degree and likelihood of my being involved in a motor vehicle accident was diminished because there was no precipitation and the street was dry; traffic was light. I took the usual precautions I take while driving my patrol unit, including controlling the speed of my patrol unit to a reasonable rate, scanning the turning area for pedestrians, checking my mirrors, and turning my head to look for traffic before attempting to make the U-turn. I was not driving at an excessive rate of speed at the time that I attempted to make the U-turn. I did not see the vehicle that was driven by Aaron Trevino. I also did not see any pedestrians in

my turning area. Believing that the southbound lanes of McCullough that I would be traversing were clear and in light of the roadway conditions and my usual precautions, I perceived no risk of crossing them to the northbound lane of McCullough. The lack of risk was outweighed by the need to quickly make the scene of the vehicle theft is in progress. Had I seen Mr. Trevino's vehicle approaching, I would not have crossed over the lane his vehicle was traveling on. I did not intentionally cause my patrol vehicle to collide with the vehicle operated by Mr. Trevino.

In his response to the City's motion for summary judgment, Trevino argued Ramos did not activate his lights or siren in order to alert the public at large that he might attempt movement of his vehicle—a U-turn—that could be considered reckless or endanger other drivers on the road. Trevino also alleged the existence of fact issues regarding the U-turn. First, he contended a fact issue exists on whether Ramos's "U-turn from an improper lane on the roadway would be considered permissible conduct." However, Trevino presented no summary judgment evidence to support this contention or to dispute Ramos's statement that "[t]here was no sign prohibiting a U-turn on the portion of McCullough that [he] was on." Second, Trevino contended,

> [r]egardless of whether Officer Ramos was in route to Squeaky Clean Car Wash or Drury Inn, neither of these destinations would have given Officer Ramos a reason to travel southbound on McCullough Avenue which creates yet another fact issue that should be submitted to a jury. Both of these destinations were on the opposite side of the highway from where Northstar [sic] Mall was located which would have required Officer Ramos to travel northbound on McCullough Avenue either way to either call. Therefore, a material issue of fact exists as to whether the Officer was reckless by failing to act in good faith by making a U-turn on McCullough Avenue from an improper lane.

Again, Trevino presented no summary judgment evidence to support these contentions or to dispute Ramos's testimony. Ramos testified that (1) the location of the criminal mischief call required him to travel southbound on McCullough Road and away from McCullough's intersection with Loop 410; (2) "[i]n order to respond to the theft of a vehicle in progress at the Drury Inn [he] would need to drive northbound on McCullough instead of the predetermined southbound route"; (3) "McCullough has three southbound lanes, two northbound lanes, and no turning lanes at the

- 16 -

point where the mall's exit lanes meet McCullough"; and (4) as he drove "eastbound on the mall's exit lanes towards where they intersect with McCullough, [he] noticed orange traffic barrels that directed exiting vehicles like [his] toward the southbound lane of McCullough [and] the orange traffic barrels prevented exiting vehicles from directly turning left and onto the northbound lanes of McCullough." Furthermore, during his deposition, Ramos stated that on the day of the accident, the weather was sunny and clear, and there was "light traffic" on McCullough. He described the accident as follows:

> I initially got a call from – to a disturbance. I was at North Star Mall and by – on the McCullough side, underground parking lot.· So I noticed that there was – there was [sic] cones on the road toward McCullough and the access road of San Pedro for 410. And I checked – I exited the parking lot and I was going southbound on McCullough.
>
> While I was going southbound, I got rerouted to a higher priority call to a, I believe it was a theft of vehicle in progress. So I got rerouted. They told me over the radio and to my screen, so I was going southbound in the number two lane. I look at my computer screen, saw that I got rerouted, saw where it was, I was familiar with the area. The theft of the vehicle was on the other side of the highway off of 410 at a nearby hotel. I checked the screen, checked my mirrors, and kind of had turned about a 90-degree angle. Didn't see anyone coming, and I turned my vehicle and didn't see the vehicle Aaron Trevino was driving from my blind spot when I was trying to turn. And after we collided, I asked if they were okay, if they needed EMS, the vehicle was drivable. They weren't injured. We relocated back into the parking lot in North Star and I notified my supervisor.

Finally, Trevino contended Ramos's conduct was not outweighed by a clear risk of harm to the public from his actions. In support of this contention, Trevino again alleged Ramos was responding to a non-emergency Code 1 call, Ramos failed to testify whether his immediate presence was actually needed at the emergency call to which he was responding, and Ramos failed to use his lights and siren. Although Ramos may not have testified his "immediate" presence was "actually" needed, he explained why an immediate response was necessary when responding to a motor vehicle theft in progress call:

6. Even if the theft of a motor vehicle in progress had not come in through the City's 9-1-1 system, such a call would constitute an emergency situation. Having investigated stolen vehicle cases in the past, I can say that a stolen motor vehicle presents an unexpected and usually dangerous situation that calls for immediate action. For one thing, a vehicle thief may become violent if confronted in the act of stealing a motor vehicle. Secondly, criminals prefer to use stolen vehicles to commit other crimes, such as drive-by shootings, drug deals, and burglaries, because it can be difficult to locate an assailant who operates a stolen vehicle rather than one that the assailant owns. Thirdly, a stolen motor vehicle constitutes a major property loss for most individuals. If the stolen motor vehicle is valued from $2,500 to $30,000, it is a theft that is classified as a state jail felony. If a vehicle theft is in progress, then the quick arrival of a police officer may be able to stop it. I have personally investigated countless stolen vehicle cases. On at least one occasion that I can recall, I stopped a stolen vehicle from being disassembled for parts.

Trevino presented no summary judgment evidence to contradict Ramos's explanation.

"Law enforcement must retain discretion to assess and balance . . . risks using reasoned judgment." *Maspero*, 640 S.W.3d at 532. Here, Ramos received a dispatch call to respond to a theft of a motor vehicle in progress. Trevino presented no summary judgment evidence that the U-turn Ramos made was illegal. Although Ramos did not activate his lights or siren, Trevino presented no summary judgment evidence that suggests this failure itself was a cause of the accident. Furthermore, Ramos's other actions just prior to the accident indicate he engaged in some degree of risk assessment. He noted there was no precipitation, the street was dry, and traffic was light. He controlled the speed of his patrol unit to a reasonable rate, scanned the turning area for pedestrians and did not see any, checked his mirrors, turned his head to look for traffic before attempting to make the U-turn, and was not driving at an excessive rate of speed when he attempted to make the U-turn. Ramos said he believed the southbound lanes of McCullough that he would be traversing were clear and, in light of the roadway conditions and his usual precautions, he did not perceive a risk of crossing them to the northbound lane of McCullough. Ramos stated he did not see Trevino's vehicle approaching, and if he had, he would not have attempted the U-turn.

At most, these facts may show an error in judgment on Ramos's part, but they do not suggest that his actions generated "extreme risk" beyond that which is inherent in a law enforcement officer's

need to quickly respond to an emergency. They also do not raise the inference that he "reckless[ly] disregard[ed]" any increased danger generated by his actions. Viewing the evidence in the light most favorable to Trevino, we conclude he failed to raise a fact issue on whether Ramos acted with conscious indifference or reckless disregard for the safety of others.

## CONCLUSION

For the reasons stated above, we conclude that pursuant to TTCA section 101.055's emergency exception, the City's immunity from suit is not waived and the trial court erred by denying the City's motion for no evidence and traditional summary judgment on jurisdictional grounds. Accordingly, we reverse the trial court's order denying the City's motion and render judgment granting the City's motion for no evidence and traditional summary judgment on jurisdictional grounds and dismissing Trevino's claims against the City for lack of subject-matter jurisdiction.[1]

Lori I. Valenzuela, Justice

---

[1] Because Trevino did not negate one of the three independent grounds on which the City moved for summary judgment (the emergency exception), we need not address whether he negated the other two grounds (the 9-1-1 exception and official immunity). *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").